## 38540. BROWN v. THE STATE.

CLARKE, Justice.

Appellant, James Willie Brown, was convicted for the murder of Brenda Sue Watson and given the death penalty. In his appeal to this court, Brown raises ten enumerations of error. For reasons which follow, we affirm.

### Facts

At approximately 8:30 p.m. of May 12, 1975, appellant and Brenda Watson arrived at the Mark Inn lounge in Gwinnett County. They ate a carryout steak and potato dinner that they had brought with them and spent several hours drinking and dancing. They left together at approximately 11:00 p.m.

Brenda Watson's body was found the next day near a trash pile close to an old logging road in a heavily wooded area some 500 feet off Deshon Road in Gwinnett County. A cord was tied around her left ankle, and she had indentations on her wrists and her right ankle which could indicate she had been tied there also. She was nude except for a blue terrycloth blouse which was pulled up over her breasts. A pair of panties had been forced so far down her throat that they were not discovered until the autopsy.

Warren Tillman of the State Crime Lab testified that Brenda Watson's death was caused by suffocation from the panties in her throat. He discovered seminal fluid and sperm in the victim's throat and vagina. From abrasions and contusions around the victim's vagina, Tillman concluded that the victim had been raped and that this had occurred before her death.

An undigested meal of steak and potatoes was found in the victim's stomach. Since a meal is usually digested within 4 hours, Tillman estimated that Watson died no later than 4:00 a.m.

Appellant was arrested May 15. Nylon cord found in his car was identical to that tied around the victim's left ankle. A hairbrush found in appellant's car contained hair similar in color and medulation to the victim's hair.

Appellant was questioned May 16. He initially denied knowing Brenda Watson. Upon being informed that he had been seen with her the night before her body had been discovered, he admitted that he and Ms. Watson had gone to the Mark Inn for drinks, but claimed that afterwards they went to a lounge off Covington Highway, where he left her. Later he stated that when they left the Mark Inn, Watson suggested they go to a quiet place in the country. Appellant took her to a secluded spot off Deshon Road. When he did, she told him that if he didn't pay her $200 she was going to call the police and claim he

had tried to rape her. Appellant's response was to tie her up and gag her. Then he decided he might as well have sexual intercourse with her. So he did. On his way home he discovered that her pocketbook was still in his car. He stopped at a bridge on Killian Hill Road and threw the pocketbook into the Yellow River.

## Enumerations of Error

1. In his first three enumerations of error, appellant raises the general grounds. The evidence, viewed in a light most favorable to the State, is sufficient to convince a rational trier of fact that every element of the offense had been proven beyond a reasonable doubt. Appellant's first three enumerations of error are without merit. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his eighth enumeration of error, appellant contends the evidence was insufficient to sustain a jury finding that he was sane on the date of the alleged offense.

(a) Appellant has a long history of mental illness. He was first admitted to Central State Hospital for evaluation in April, 1968, following his arrest on charges of assault with intent to rape, robbery, and two counts of assault with intent to murder. A provisional diagnosis of "Psychoneurotic Disorder, Dissociative Reaction" was made, but no signs of psychosis were noted, and the examining doctors recommended that appellant be returned to the custody of the court for further disposition of the charges against him.

Appellant pled guilty and was sentenced December 2, 1968, to serve 10 years on each count. On December 20, 1968, appellant was re-admitted to Central State for further evaluation and treatment. Upon further examination, appellant's diagnosis was changed to "Personality Disorder, Paranoid Personality # 301.0." Appellant remained in Central State until May, 1971. The final summary from Central State noted that the results of appellant's physical examinations, his lab tests, and his neurological examination were within normal limits. His IQ was average. He had made a good adjustment with minimum supervision and had never been a management problem. Appellant had requested that he be returned to the State Board of Corrections as he was soon going to be eligible for parole. Since it was felt that appellant had reached maximum benefits from his hospitalization, he was discharged.

In December, 1972, appellant, now on parole, voluntarily re-admitted himself to Central State, complaining that his nerves were bad. Appellant was found to be suffering from a "mild to moderate" degree of psychiatric impairment, but no hallucinations, delusions, or other symptoms of psychosis were noted and appellant was found to be well oriented as to time, place, person and situation.

The diagnosis was the same; paranoid personality # 301.0. Appellant was discharged in January, 1974.

Appellant was re-admitted on June 4, 1975, for evaluation following his arrest for the murder of Brenda Watson. He exhibited indications of both visual and auditory hallucinations. The examining psychiatrist concluded that appellant had deteriorated since his previous diagnosis and was now overtly psychotic. The provisional diagnosis was "Schizophrenia, paranoid type # 295.3." Based upon this evaluation, appellant's special plea of insanity was sustained. See Code Ann. § 27-1502.

Appellant remained at Central State until February 10, 1977. After being placed on medication and given intensive treatment, his condition had improved to the point that he was no longer psychotic. He was returned to the custody of the court for the final disposition of his case.

Appellant, however, decompensated in the Gwinnett County jail, and another psychiatric examination was ordered. He was found to be psychotic again, and a second special plea of insanity was sustained in July, 1977. Appellant returned to Central State.

By April, 1980, appellant's hallucinations had abated, and he was able to relate to staff and other patients in an acceptable manner. In a staff conference, it was decided that appellant had improved to the extent that he could be sent back to court. A third special plea of insanity was tried before a jury on April 8, 1981, and appellant was found to be competent to stand trial. He was tried in June, 1981.

(b) In support of his insanity defense, appellant relied upon his prior history of mental illness, testimony from his mother that he did not know right from wrong on the date of the offense, testimony from his original attorney that when he first talked to appellant nine days after the offense, appellant did not know right from wrong, and a letter written by psychiatrist Julius Ehik (admitted without objection), who had examined appellant at the Gwinnett County jail October 14, 1980. Dr. Ehik concurred in the diagnosis of paranoid schizophrenia. He stated: "Considering the type of illness and findings indicated in his chart and my present examination, it is my opinion that the probability certainly exists that [appellant was] psychotic at the time of the alleged offense and that he acted upon delusions and therefore could not distinguish between right and wrong at that time."

The State did not rely merely upon the presumption of sanity but introduced considerable evidence that appellant was sane at the time of the offense. Compare, *Brooks v. State,* 247 Ga. 744 (279 SE2d 649) (1981).

Various lay witnesses who had the opportunity to observe appellant before and shortly after the offense testified that in their opinion, appellant was sane and knew right from wrong at the time he was observed. See, *Gee v. State,* 239 Ga. 583 (2) (238 SE2d 356) (1977); *Flanagan v. State,* 103 Ga. 619 (4) (30 SE 550) (1898). These witnesses included a bartender at the Mark Inn lounge, where appellant had been a regular customer for four months, who saw appellant with Brenda Watson the evening of May 12, 1975; the proprietor of a tire store who had gone to school with appellant, who saw appellant on May 14, 1975, when he came to buy two tires; two of the arresting officers; various jail personnel who observed appellant immediately after his arrest; and the two officers who interrogated appellant.

In addition, it was shown that appellant told the officer who took his personal history upon his arrest for the murder of Brenda Watson that "he wasn't worried about this charge; he would plead insanity and in a few years he would be out."

In 1973, appellant told his wife's niece that if he got in any trouble, "all he would have to do is make out like he was crazy" and "nothing would happen to him other than being placed back in Milledgeville."

In 1976, appellant met Anita Tucker at the Gwinnett County jail. She was charged with murder. Appellant told her that if she played crazy she would only serve two years in a mental hospital. He advised her to look wild and talk in circles as if she didn't know what day it was. Two years later, appellant saw Ms. Tucker at the dental clinic at Central State Hospital. He asked her what sentence she got. She told him life. He winked and said, "What did I tell you."

Dr. Jose M. Delatorre, the director of the forensic services division at Central State Hospital, was asked by the court in September, 1980, for his opinion of appellant's sanity at the time of the offense. Dr. Delatorre was unable to give a definite opinion at that time, partly because of appellant's inability or unwillingness to tell Dr. Delatorre about the events surrounding the alleged offense.

However, when posed a hypothetical question by the District Attorney, incorporating facts testified to by the other State's witnesses, Dr. Delatorre, noting that appellant had shown no signs of psychosis prior to June, 1975, testified that if "all these facts are true, [appellant] was in good touch with reality and able to distinguish between right and wrong . . ." on May 13, 1975.

(c) Before we can determine the question of the sufficiency of the foregoing evidence with regard to sanity, we must determine,

first, on whom the burden of proof lay in this case, and second, by what standard we conduct our review of the evidence.

Generally speaking, "Georgia law presumes the sanity of an accused. Code Ann. § 26-606." *Durham v. State,* 239 Ga. 697, 698 (1) (238 SE2d 334) (1977). Insanity is an affirmative defense which a defendant must prove by a preponderance of the evidence. Ibid.[1] It is also true, however, that "the law presumes the continued existence of a mental state once proved to exist. Code § 38-118." Ibid.

*Handspike v. State,* 203 Ga. 115 (45 SE2d 662) (1947), has been cited for the proposition that a presumption of insanity arises where a jury at a special hearing on insanity finds a defendant to be insane and incompetent to stand trial. *Durham v. State,* supra; *Boyd v. State,* 207 Ga. 567, 569 (63 SE2d 394) (1951). However, in *Brooks v. State,* 247 Ga. 744, supra, we noted that a so-called "special plea of insanity" requires, not a determination of the defendant's sanity, but a determination of whether the defendant at the time of the trial is capable of understanding the nature and object of the proceedings against him and is capable of assisting his attorney with his defense. A "special plea of insanity" is a misnomer because the issue is one of incompetence rather than insanity. *Echols v. State,* 149 Ga. App. 620 (255 SE2d 92) (1979). A general plea of insanity, on the other hand, raises insanity as a defense and is an inquiry into whether the defendant could distinguish between right and wrong, or was suffering from a delusional compulsion, at the time of the crime. Code Ann. §§ 26-702, 703.

At least since the 1977 amendment to Code Ann. § 27-1502, it has been clear that a defendant is entitled to a special jury only to determine his mental competence to stand trial. *Echols v. State,* supra. A jury finding of incompetence to stand trial, rendered after the alleged offense occurred, ought not give rise to a presumption that a defendant was insane at the time of the crime.

*Handspike v. State,* supra, was overruled in *Brooks v. State,* supra. Any implication in *Handspike* and later cases that a presumption of insanity at the time of the offense arises from a subsequent special jury finding of mental incompetence to stand trial will not be followed.[2]

---

[1] In Grace v. Hopper, 566 F2d 507 (5th Cir. 1978), the Fifth Circuit, relying on Leland v. Oregon, 343 U. S. 790 (72 SC 1002, 96 LE 1302) (1952); Rivera v. Delaware, 429 U. S. 877 (97 SC 226, 50 LE2d 160) (1976); and Patterson v. New York, 432 U. S. 197 (97 SC 2319, 53 LE2d 281) (1977), held that "the Georgia rule suffers from no constitutional infirmity." 566 F2d at 510.

[2] From a jury finding of incompetence to stand trial, a presumption would arise, by virtue of Code Ann. § 38-118, that the defendant thereafter is incompetent to stand

Admission to a mental institution will not give rise to a presumption of insanity absent an adjudication of insanity. *Durham v. State,* supra. Thus, appellant's admissions to Central State prior to 1975 would not give rise to a presumption that he was insane at the time of the crime.[3]

We conclude that appellant bore the burden of proving by a preponderance of the evidence that he was insane at the time of the offense.

In *Brooks v. State,* supra, we held that because jurors are not bound by the opinions on sanity of either lay or expert witnesses, the jury may reject defense testimony on insanity even if uncontradicted; the presumption of sanity does not disappear upon the introduction of evidence to the contrary and may be relied upon by the jury even after the introduction of evidence of insanity.

Where the standard of proof in the trial court is the "preponderance of the evidence," this court ordinarily reviews the sufficiency of the evidence using the "any evidence" test. See, *Dept. of Human Resources v. Montgomery,* 248 Ga. 465 (1) (284 SE2d 263) (1981). With regard to the sanity of the accused in a criminal case, however, this standard of review is inadequate since the presumption of sanity would always provide some evidence in support of a finding of sanity.

While it is a jury's function to determine the credibility of witnesses and the probative value of testimony, juries must weigh the evidence and may not arbitrarily ignore it. Insanity may be so clear and the proof so overwhelming that a jury finding of sanity cannot be upheld. See Herbert v. State, 357 S2d 683 (Ala. Cr. App. 1978).

We conclude that an appropriate standard of appellate review of the sufficiency of the evidence with regard to a jury's finding of sanity in a criminal case is whether after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found

---

trial. Such a presumption would not survive a proper release from the mental institution to which the defendant would be sent following such an adjudication under Code Ann. § 27-1502. *Gilbert v. State,* 235 Ga. 501 (220 SE2d 262) (1975). We note that the state assumed the burden of proof at the hearing on appellant's third special plea of insanity. The jury's finding at that hearing, that appellant was competent to stand trial, destroyed whatever presumption of appellant's incompetence remained.

[3] The evidence shows that appellant was not psychotic when he was at Central State Hospital prior to 1975. Dr. Delatorre testified that only 30 to 35 percent of those admitted to mental hospitals are psychotic; the rest suffer from less serious mental disorders.

that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the crime. Cf. *Blackburn v. Blackburn*, 249 Ga. 689 (292 SE2d 821) (1982).

(d) Applying the above standard, we find the evidence clearly sufficient to support the jury's finding that appellant was sane at the time of the offense.[4]

3. In his fourth enumeration of error, appellant attacks the constitutionality of the Georgia Unified Appeal Procedure.

He first contends the procedure should not have been used in his case because he was indicted on October 22, 1975. Utilization of the procedure is required in every case in which the death penalty is sought on an indictment returned after August 25, 1980. Appendix to Code Ann. Chapter 27-25 — The Georgia Unified Appeal Procedure, editorial note. In the discretion of the trial court, the Unified Appeal Procedure may be used in cases pending on August 25, 1980. Ibid. Appellant has not demonstrated how this discretionary power to use the procedure as to defendants indicted prior to August 25, 1980, including himself, violates any constitutional provision.

Appellant next contends that the Unified Appeal Procedure is unconstitutional because its utilization is a prerequisite to the right of habeas corpus. We cannot agree that a defendant's right to seek or obtain habeas corpus relief is adversely affected by either the use of the Unified Appeal Procedure or by the failure to use it. This contention is meritless.

Appellant complains that the Unified Appeal Procedure requires him to adhere to a prescribed schedule for preparation of the case for trial. He also complains that the pre-trial hearing limits and restricts the activity of the defense, causing a breakdown of due process. Appellant has not demonstrated, and we fail to see, how adherence to a schedule, to the extent such adherence is required, involves a breakdown of due process. Moreover, the "outline and checklist are intended to assist [defense counsel] in protecting the defendant's rights, but it remains the responsibility of defense counsel to protect those rights . . ." Outline of Proceedings, Rule I A (3). Appellant has not demonstrated how the Unified Appeal Procedure restricts activity by defense counsel on behalf of the defendant.

Appellant's remaining contentions with regard to the Unified

---

[4] The trial court charged the jury that if some evidence of insanity was introduced, the state would bear the burden of proving beyond a reasonable doubt that appellant was sane. This charge, while erroneous, was beneficial to appellant and therefore harmless.

Appeal Procedure have been decided adversely to him in *Sliger v. State,* 248 Ga. 316 (282 SE2d 291) (1981). His fourth enumeration of error is meritless.

4. Before trial, appellant filed a plea in bar in which he claimed (1) the delay in bringing him to trial violated his constitutional right to a speedy trial and (2) that the failure of his original attorney to seek an opinion as to whether or not appellant knew the difference between right and wrong at the time of the alleged offense denied appellant effective assistance of counsel. The plea in bar was denied and appellant asserts in his fifth enumeration of error that this denial was erroneous.

The delay in bringing appellant to trial was caused by his incompetence to stand trial. *Gibbs v. State,* 235 Ga. 480 (2) (220 SE2d 254) (1975). Appellant has shown no delay since he was adjudicated competent to stand trial.

Appellant's original attorney testified at the hearing on the plea in bar that during the course of his representation of appellant, he sought from doctors at Central State an opinion as to appellant's sanity at the time of the crime but was told that they were unable to render such an opinion.

The trial court did not err in denying appellant's plea in bar.

5. The trial court did not err in admitting evidence of two earlier attempted rapes by appellant.

In 1968, as Darby Gibson was preparing to move to another apartment, appellant entered through a door that had been left open. He shut the door, forced her at gunpoint to go to her bedroom, made her strip, and then tried to rape her. Afterwards he searched her purse and then told her he was going to have to gag her. He got a washcloth out of her bathroom, hit her on the head with his gun and forced the washcloth into her mouth. When he started stabbing her, she screamed and he ran out of the apartment.

In 1974, Phyllis Robertson met appellant in a coffee shop. He told her he was a painter and would paint her picture. They left in his car. He took her to a secluded area and forced her at gunpoint to remove her clothes. He tied her hands with white corded rope (similar to that used to tie Brenda Watson) and masturbated on her. Then he left, taking her purse with him.

"Although the two occurrences were not identical, there were sufficient similarities to authorize the trial court to admit the testimony. *Bloodworth v. State,* 233 Ga. 589 (3) (212 SE2d 774) (1975)." *Mauldin v. State,* 239 Ga. 739 (239 SE2d 5) (1977). Appellant's sixth enumeration of error is meritless.

6. In his seventh enumeration of error, appellant contends the state suppressed exculpatory evidence in violation of Brady v.

Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963) and that he is therefore entitled to a new trial.

At a post-trial hearing connected with appellant's motion for new trial, Dr. Steven Marinkovic testified in passing that he had conducted an evaluation of appellant on October 10, 1980, during which he had come to the conclusion that appellant was not then competent to stand trial.

It is not disputed that the District Attorney had no knowledge of Dr. Marinkovic's evaluation until this testimony was elicited. Dr. Marinkovic's written report of the evaluation was subsequently made part of the record. In the report, Dr. Marinkovic stated: "In our opinion [appellant] needs treatment and he does not seem to be able to stand trial. He may understand the questions, but his judgment and insight are poor."

Subsequent investigation revealed that, unbeknownst to the District Attorney, on October 10, 1980, the administrator of the Gwinnett County Jail had sent appellant to the mental health clinic in Lawrenceville for examination because he had been writing offensive letters to female inmates. The administrator did not receive a report of the examination. This was not unusual, testified the administrator, who routinely sent prisoners to the clinic three to five times a week. Rather, the deputy who transported a prisoner would be verbally informed by the clinic as to recommended medication, if any.

It is clear that no evidence was suppressed by the prosecution. The report was not part of the state's files, nor was its existence known to the prosecutor or to any law enforcement officer. See, *Reed v. State,* 249 Ga. 52 (3) (287 SE2d 205) (1982). Brady v. Maryland applies only to evidence known to the prosecution, but unknown to the defense. United States v. Agurs, 427 U. S. 97, 103 (96 SC 2392, 49 LE2d 342) (1976). The state is not required to investigate the case for the defense and the "prosecution does not 'suppress' evidence by refusing to conduct a search for it, even though the evidence may be more accessible to the state than to the defense." *Hicks v. State,* 232 Ga. 393, 395 (207 SE2d 30) (1974).

To the extent that appellant's contention may be viewed as an argument that the report is newly discovered evidence of such materiality as to require a new trial, it must still be rejected. In view of the extensive evidence regarding appellant's mental condition presented by both the prosecution and the defense, Dr. Marinkovic's report must be regarded as merely cumulative. Moreover, Dr. Marinkovic did not address the issue of appellant's sanity on May 13, 1975, the date of the offense, and his evaluation of appellant's mental condition in October, 1980, is of limited probative value with regard

to the issues raised in the trial of the case.[5] See *Emmett v. State,* 232 Ga. 110 (7) (205 SE2d 231) (1974).

7. In his ninth enumeration of error, appellant contends the trial court violated appellant's right to due process of law under both the U. S. and Georgia constitutions by proceeding with his motion for new trial while he was incompetent and unable to render his attorney such assistance as a proper defense demanded.

We note that aside from the requirements of the Georgia Unified Appeal Procedure, "there is no law or constitutional principle which guarantees to a prisoner the right to be present in court upon the hearing of his motion for a new trial." *Sims v. Smith,* 228 Ga. 136 (184 SE2d 347) (1971). Accord, *Dobbs v. State,* 245 Ga. 208 (264 SE2d 18) (1980); *Drake v. State,* 248 Ga. 891 (2) (287 SE2d 180) (1982). Under Rule IV A (5) (c) of the Unified Appeal Procedure, however, the defendant is given the right to be present during the entire hearing on the motion for new trial unless he knowingly, voluntarily, and intelligently has waived this right in writing. By implication, this rule requires the presence of a defendant who is mentally competent and capable of assisting his attorney. Cf. Pate v. Robinson, 383 U. S. 375, 384 (86 SC 836, 15 LE2d 815) (1966).

Upon indications that appellant had decompensated after receiving the death penalty, the trial court continued the hearing on the motion for new trial until such time as appellant could be evaluated and declared able to proceed. On January 6, 1982, two doctors from Central State testified that in their opinion, appellant was competent and able to assist his attorney. The court's decision thereafter to proceed with the motion for new trial was not erroneous.

8. In his final enumeration of error, appellant contends the trial court erred in admitting his confession. The trial court conducted a Jackson-Denno hearing outside the presence of the jury and, after hearing evidence, determined that appellant was mentally competent at the time he confessed and that he had freely and voluntarily waived his Miranda rights. These determinations by the trial court were not clearly erroneous and we must therefore accept them. *Rose v. State,* 249 Ga. 628 (2) (292 SE2d 678) (1982). Appellant's tenth enumeration of error is without merit.

### Sentence Review

9. Upon review of the record in this case, we conclude that the

---

[5] With regard to the pre-trial hearing on appellant's special plea pursuant to Code Ann. § 27-1502, we note that appellant was evaluated on the date of the hearing by Dr. Embry Collins, who found appellant competent to stand trial.

sentence of death was not imposed under the influnce of passion, prejudice, or other arbitrary factor.

10. The jury found two statutory aggravating circumstances: (1) "The offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit: the forcible rape of the victim (Code Section 27-2534.1-B-2)," and (2) "The offense of murder was outrageously or wantonly vile, horrible and inhuman in that it involved torture to the victim or depravity of mind on the part of the defendant (Code Section 27-2534.1-B-7)."

The evidence supports both findings. With regard to the finding of the (b) (7) aggravating circumstance, we note that "[t]orture occurs when the victim is subjected to serious physical abuse before death," and that "[s]erious sexual abuse may be found to constitute serious physical abuse." *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980). Furthermore, where "only facts occurring prior to death are relied upon to support a finding of torture . . ., the fact that the victim was tortured . . . will also support a finding of depravity of mind of the defendant." Ibid.

11. We find that similar cases listed in the appendix support the affirmance of the death penalty in this case.

The victim in this case was tied, raped and sodomized. She was dragged around while still alive, causing abrasions to her breasts, and she was slowly suffocated by appellant, who forced her own panties so far down her throat that it took "a tremendous amount of force to pull the panties out at the time of the autopsy." Moreover, appellant had twice committed similar acts.

Where sufficient aggravating circumstances have been presented, juries have been willing to recommend the death penalty in cases in which the defendant presented evidence of mental infirmities falling short of insanity. See *Waters v. State,* 248 Ga. 355 (18) (283 SE2d 238) (1981), and cases cited therein.

We conclude that appellant's sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, taking into consideration both the crime and the defendant.

12. We have reviewed the record and find no addressable error not enumerated by appellant.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 5, 1982 —
REHEARING DENIED OCTOBER 27, 1982.

*Hester & Hester, Frank B. Hester,* for appellant.
*Bryant Huff, District Attorney, Michael J. Bowers, Attorney*

*General, Virignia H. Jeffries, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Allen v. State,* 248 Ga. 676 (286 SE2d 3) (1982); *Blankenship v. State,* 247 Ga. 590 (277 SE2d 505) (1981); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981); *Gates v. State,* 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State,* 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State,* 243 Ga. 291 (253 SE2d 729) (1979); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976).