S89P0175. MEDERS v. THE STATE.
(389 SE2d 320)

CLARKE, Chief Justice.

The appellant, Jimmy Fletcher Meders, was convicted in Glynn County of malice murder and armed robbery. He was sentenced to death.

Meders spent the afternoon and evening of October 13, 1987, in the company of three other men: his employer, Randy Harris; Harris' cousin Bill Arnold; and a friend of the latter, Greg Creel. The four began drinking that afternoon and continued drinking into the evening. Harris eventually parted company with the other three to entertain a teenage girl in a motel room. Meders and the other two borrowed Harris' car and spent a few hours bar-hopping. At 2:30 a.m., Creel stated he was hungry. They stopped at a convenience store. Arnold stayed in the car, while Creel and Meders entered the store. Creel went to the back of the store to warm a package of sausage-biscuits in the microwave oven. Meanwhile, Meders made a small purchase. When the cashier opened the register, Meders shot him in the chest with a .38 caliber revolver. The victim hit the wall and fell to the floor. Meders then shot him again, in the head.

Creel ran out of the store to the car when the first shot was fired, leaving his food behind. After removing the money from the cash drawer (and triggering a silent alarm in the process), Meders joined the other two before they could leave without him. They drove to a trailer park, where Arnold and Creel got out. After offering the other two a share of the take — which they declined — Meders left them and drove to Harris' motel room. He woke Harris and told him he had "just blowed a man's head off over thirty-eight dollars."

Meders was soon arrested. Some of the "bait" money from the store, whose serial numbers had been recorded, was found in Meders' wallet after he was arrested. Seventeen food stamps were found in the pocket of his coat. The murder weapon was found under the mattress of his waterbed.

The evidence, reviewed in the light most favorable to the verdict, supports the conviction. *Jackson v. Virginia,* 443 U. S. 307 (99 SC

2781, 61 LE2d 560) (1979).[1]

1. Before trial, Meders' attorney filed a motion seeking funds for an examination by a "private psychiatrist, psychologist or other medical expert to determine his sanity at the time of the alleged offenses with which he is charged and his ability to aid his attorneys in his defense." Meders, testifying personally at the hearing on this motion, contended he had a nervous breakdown on November 12, 1988 (slightly more than a year after his arrest). He saw a doctor who prescribed medicine for depression and anxiety. He testified that he was worried about his wife and children and his personal life, and was concerned about "the circumstances of what I am facing . . . I don't know what is going to happen in this case." He understood that the purpose of the hearing was to see if the judge was going to "grant a private or a state physician." He testified on cross-examination that he knew the difference between right and wrong and that he had no problem communicating with his attorneys. His cross-examination ended as follows:

> Q. (By the State): . . . I want to make sure I understand the position you are taking. The fact that you have been over to Mental Health and talked to those folks, that has helped you some, is that right, would that be fair to say?
> A. Really the only way it has helped me is he give me a medication to make me sleep.
> Q. Okay, and what you are asking the court to do is appoint a psychiatrist to treat you in terms of the depression you are having and the anxiety and you are asking for a private one rather than a state- sponsored one?
> A. Yes, sir.
> Q. Okay, . . . you are not incompetent, are you?
> A. No, sir, not really.

The defendant was the only witness. Arguing that psychiatrists employed by the state are unfit, Meders' attorney asked the court to authorize a "private psychiatrist to conduct a diagnostic examination of the defendant." The court declined to award funds for a private psychiatrist but authorized an evaluation by "one of the psychiatrists on the state staff."

Nothing further was raised on this issue until after the jury was

---

[1] The crime was committed early in the morning of October 14, 1987. Meders was arrested later that day. He was indicted on December 16, 1987. The trial began on April 3, 1989, and ended on April 7, 1989. A motion for new trial was filed on April 24, 1989. The motion was heard on May 30, 1989, and denied June 8, 1989. The record was docketed in this court on June 22, 1989. After extensions of time were granted to the parties, the case was argued orally on October 10, 1989.

selected. During a Unified Appeal Procedure hearing before any evidence was presented, Meders' attorney reminded the court of his motion for psychiatric examination, and told the court he had not yet heard from the psychiatrist. Both the court and the state had received a copy of the psychiatrist's report. The court asked the defendant's attorney if he would "like to take a minute to read that right now?" The defendant's attorney responded:

> *Mr. Davis* [for the defendant]: Well, I would just like to ask Mr. Johnson, it would serve, serve my purpose to just, if he would state in his place, does the copy state, or does the report, rather, state that the defendant is compos mentis, that he is, that he is able to stand trial?
>
> *Mr. Johnson* [for the state]: As I understand the report, Your Honor, it does say quite a bit, but boiling it down to the, the two main points, it does say that he is competent to stand trial at this time and it appears that he was competent at the time the act was, that the act occurred. So, but I will, we have gone to have that xeroxed right now, and we will give it to Mr. Davis before we leave right now.
>
> *Mr. Davis*: Well, that serves my purpose, Your Honor.

The foregoing is all the record shows about the contents of the report.

(a) Meders concedes he did not file a plea of incompetence to stand trial. See OCGA § 17-7-130. However, relying on such cases as *Pate v. Robinson*, 383 U. S. 375 (86 SC 836, 15 LE2d 815) (1966); *Holloway v. State*, 257 Ga. 620 (361 SE2d 794) (1987); and *Baker v. State*, 250 Ga. 187 (297 SE2d 9) (1982); he contends the trial court should have conducted a hearing sua sponte to determine his competence to stand trial. We do not agree.

The defendant's testimony and the court-ordered evaluation show that he understood "the nature and object of the proceedings against him and is capable of assisting his attorney with his defense." *Brown v. State*, 250 Ga. 66, 70 (295 SE2d 727) (1982). The trial court did not err by failing to conduct further investigation on this issue sua sponte.

(b) Meders also contends the trial court's refusal to grant funds for an independent psychiatrist was error. He relies on *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985) to support his contention that he was entitled to an independent psychiatrist. This reliance is misplaced. Ake's pre-trial behavior was so bizarre the trial court ordered an evaluation sua sponte. The examining psychiatrist reported that Ake was delusional and was probably a paranoid schizophrenic. After further evaluation, it was determined that Ake

was not competent to stand trial. However, after several weeks of treatment and medication, Ake stabilized enough that he was able to stand trial. Notwithstanding Ake's severe mental problems, the State of Oklahoma denied him psychiatric assistance on the issue of sanity at the time of the crime. The U. S. Supreme Court reversed his conviction, holding that Ake had demonstrated "his sanity at the time of the offense [would] be a significant factor at trial," and was entitled to independent psychiatric assistance.

In this case, by contrast, neither the defendant nor his attorneys reported any difficulty communicating with each other. The defendant himself testified that he was not incompetent, and although he was depressed at the prospect of being executed, nothing about his behavior could be characterized as bizarre. Unlike Ake, Meders was evaluated on the issue of sanity and the examiner found him to have been sane at the time of the crime as well as competent to stand trial. Nothing before the court reasonably indicated that Meders' sanity would be a significant factor at trial. Hence, the trial court did not err by refusing to provide funds for an independent psychiatrist. *Thomas v. Jones*, 891 F2d 1500 (C) (11th Cir. 1990).

2. On December 14, 1981, the judges of the Brunswick Judicial Circuit approved and published a rule of court establishing a plan for the selection of jurors by electronic means pursuant to OCGA § 15-12-42. The plan set out the procedures to be followed by the jury commissioners and the clerk of court to compile the lists of grand and traverse jurors, to update the lists, and to draw grand jurors and traverse jury venires. The Data Processing Center of Glynn County was designated a "necessary component" of the plan, and given the responsibility for storing the lists on "magnetic computer tape," for programming the computer to randomly select names from the lists when called upon to do so by a judge of the superior court, and for furnishing printouts of the lists and of the jurors selected from those lists.

On March 1, 1989, Meders filed a "motion to quash the indictment," alleging the indictment was null and void because the grand jury which returned it was not selected according to the 1981 rule of court establishing the plan by which jurors were to be selected.

The evidence presented on the motion showed that after February 1987, the Data Processing Center was relieved of its responsibilities for jury data storage and retrieval (for reasons not appearing on the record), its computer tapes were given to the clerk of superior court, and the data was programmed into a UNISYS computer system that was set up in the clerk's office. Although the Data Processing Center no longer played any role in the maintenance of the jury lists or in the selection of jurors from the lists, the procedures followed were essentially the same under the new system with one ex-

ception: Under the original system, selection of grand jurors and of traverse jury venires was completely random; under the new system, selection of jurors was random *except* that the UNISYS system was programmed to select grand juries and traverse jury venires that would have the same racial composition as the lists from which the selection occurred. In other words, as appellant argues, under the new system, "Glynn County carried the requirement of fair representation to the selection of the venire," not just the master lists.

(a) In *Pollard v. State,* 148 Ga. 447 (96 SE 997) (1918), we stated:

> It is . . . said that statutes regulating the selection, drawing, and summoning of jurors are intended to distribute jury duties among the citizens of the county, provide for rotation in jury service, and are merely directory. . . . Obviously, however, a disregard of the essential and substantial provisions of the statute will have the effect of vitiating the array.

Id. at 453. The defendant argues that he has shown a substantial disregard of the jury selection statutes; the state contends that any deviations are too minor to vitiate the array. Compare, c.f., *Joyner v. State,* 251 Ga. 84 (3) (303 SE2d 106) (1983) with *Franklin v. State,* 245 Ga. 141 (1) (263 SE2d 666) (1980).

The cases cited by both parties are somewhat off the mark here. In this case, there has been no violation of the statutes *per se.* Nothing in OCGA §§ 15-12-40 or 15-12-42 forbids the clerk from maintaining and operating in the clerk's office the electronic equipment used to store and retrieve the jury data. Nor do these code sections forbid programming the jury-selection computer to racially balance the venires it selects. Hence, under the statutes, the judges of the Glynn County Superior Court could have filed a new plan incorporating the changes in procedures since the original plan was filed. See OCGA § 15-12-42 (b) (2) (D) and (b) (4) (D). In fact, they could have done so in response to the very motion filed in this case which is the subject of this enumeration of error. In any event, however, what is complained of here is a lack of compliance with a trial court directive. As we stated in *Hightower v. State,* 259 Ga. 770, 771 (2) (386 SE2d 509) (1989), "the enforcement of its directives is a matter committed primarily to the trial court's sound exercise of discretion." As far as any alleged non-compliance with the plan is concerned, we do not find an abuse of discretion necessitating reversal.

(b) The defendant also contends it is unconstitutional to ensure that venires have the same racial balance as the lists from which they are chosen. He likens the Glynn County jury selection procedure to the minority set-aside plan found unconstitutional by the U. S. Supreme Court in *City of Richmond v. J. A. Croson Co.,* 488 U. S. ____

(109 SC 706, 102 LE2d 854) (1989). The constitutional issue was not raised below and is therefore not preserved for appeal.

(c) Nevertheless, although we do not agree with the defendant's suggestion that the present Glynn County selection procedure alters the odds that a person on the jury list will be selected for a particular venire,[2] we do not recommend manipulating the jury selection process.

> [Rather than] to structure each jury [venire,] . . . [t]he logical, and desirable, way to impanel an impartial and representative jury — and the method chosen by Congress — is to put together a complete list of eligible jurors and select *randomly* from it, on the assumption that the laws of statistics will produce representative juries most of the time. This approach safeguards the selection process from possible manipulation and ensures the independence of the jury.

J. Van Dyke, Jury Selection Procedures 18 (1977). (Emphasis supplied.) (Quoted in *Holland v. Illinois*, 493 U. S. ____ (110 SC ____, 107 LE2d 905) (1990) (Stevens, J., dissenting (fn. 10)). Accord *Larmon v. State*, 256 Ga. 228 (345 SE2d 587) (1986). See also *Parks v. State*, 254 Ga. 403, 412-413 (fn. 5) (330 SE2d 686) (1985).

3. Absent any objection by the defendant the court did not err by admitting the contents of the defendant's wallet in evidence.

4. The defendant did not object at trial to the prosecutor's closing argument and, having reviewed the complaints he now makes on appeal, we conclude the prosecutor's arguments did not result in the death sentence being imposed under the influence of passion, prejudice, or other arbitrary factor. *Kinsman v. State*, 259 Ga. 89 (11) (376 SE2d 845) (1989).

5. At a conference conducted outside the presence of the jury pursuant to the Unified Appeal Procedure, the defendant stated that certain defense witnesses who could have corroborated his testimony could not be located because he had only four days notice of the trial. In view of the many pre-trial hearings and the length of time that elapsed between the arrest and the trial, it is difficult to credit the defendant's claim that he did not have notice of the date of the trial or sufficient time to locate witnesses essential to his case. In any

---

[2] Assume a jury list of 1,000 persons, of whom 80% are white and 20% are black. If the computer is instructed randomly to select one hundred persons for a jury venire, then the odds that any one person is selected are 100/1000 or 1 in 10. If the list is broken down into two groups, one composed of 800 whites and the other of 200 blacks, and the computer randomly selects 80 of the 800 and 20 of the 200 (which, in essence, is what happens in Glynn County), then a white person on the list has 80 chances in 800—or 1 in 10—of being selected, while a black person has 20 chances in 200—or 1 in 10—of being selected.

event, the court gave the defendant an opportunity to perfect the record. Thus, the defendant was not, as he claims, denied a hearing on this issue.

6. There was no error in the admission in evidence of material and relevant photographs of the victim. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987).

7. There was no error in the admission of the defendant's pretrial statements. See, e.g., *Parks v. State*, 254 Ga. 403 (1) (330 SE2d 686) (1985).

8. That three grand jurors allegedly knew the defendant and did not like him provides no ground for reversal. *Pitts v. State*, 259 Ga. 745 (1) (386 SE2d 351) (1989).

9. We do not agree that the Unified Appeal Procedure is unconstitutional on its face, or as applied in this case. *Isaacs v. State*, 259 Ga. 717 (7) (386 SE2d 316) (1989); *Sliger v. State*, 248 Ga. 316 (282 SE2d 291) (1981).

10. Appellate counsel did not represent Meders at trial or on the motion for new trial, and have become involved in this case only since it was docketed in this court on appeal. The state contends the defendant's present attorneys have raised questions about the effectiveness of trial counsel and ask us to remand the case to the trial court for a hearing on this issue. The defendant's attorneys deny having raised this issue and contend it should not be and, under our decisions cannot be, considered by us. See, e.g., *Cohran v. Carlin,* 254 Ga. 580 (1 a) (331 SE2d 523) (1985).

We note that Meders has asked for a remand on the issue of his competence to stand trial, appellant's brief at p. 13, and, in enumeration of error B, contends he was denied "assistance of counsel" (albeit in the context of a claimed denial of expert assistance). Moreover, he raises a number of issues that were not raised or not objected to below. We agree with the state that the defendant's brief at least injects a concern about the issue of effectiveness.

We have held that, where the issue of effectiveness is raised for the first time on appeal by an appellate attorney who did not represent the defendant at trial or on motion for new trial and who did not file an amended motion for new trial, a remand for hearing on the issue of effectiveness may be appropriate. *Johnson v. State*, 259 Ga. 428 (3) (383 SE2d 115) (1989). Moreover, the Unified Appeal Procedure provides:

> At any time after the case is docketed in the Supreme Court, the Superior Court may be directed by the Supreme Court to conduct further hearings, or to hold additional conferences for specified purposes, or to make additional findings of facts or conclusions of law in respect to issues raised by the parties

on appeal or perceived by the Supreme Court although not asserted by the defendant or the state.

Rule IV (B) (1) of the UAP, Ga. Court & Bar Rules at 9-15.

The question of effectiveness will likely have to be addressed at some point, and we see no reason not to do it now. We therefore grant the state's request for a remand to give defendant an opportunity to litigate this issue. If it is necessary to appoint counsel to represent the defendant on remand, the court shall do so.[3] See *Amadeo v. State*, 259 Ga. 469 (384 SE2d 181) (1989). After the conclusion of the proceedings on remand, the case shall be returned to this court for review of the proceedings on remand and for the sentence review, unless the result of such proceedings obviates the need for further appellate review.

*Remanded for further proceedings. All the Justices concur, except Benham, J., who concurs specially.*

DECIDED FEBRUARY 28, 1990 —
RECONSIDERATION DENIED MARCH 29, 1990.

*John W. Davis, Maloy & Jenkins, W. Bruce Maloy, James K. Jenkins,* for appellant.

*Glenn Thomas, Jr., District Attorney, John B. Johnson III, Assistant District Attorney, Michael J. Bowers, Attorney General, Leonora Grant, Joseph L. Chambers,* for appellee.

---

[3] The record before us does not show by what manner the defendant's present attorneys were retained to represent him, nor does it disclose the scope of their agreement to represent. We therefore can express no opinion at this juncture about what obligation, if any, they have to represent the defendant at the hearing on remand.