[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 14-14178; 15-14734

_____

D.C. Docket No. 2:07-cv-00090-LGW-JEG

JIMMY FLETCHER MEDERS,

Petitioner-Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

On Petition for Rehearing by the Panel

_____

(January 4, 2019)

Before ED CARNES, Chief Judge, MARCUS, and NEWSOM, Circuit Judges.

ED CARNES, Chief Judge:

The Appellant, Jimmy Fletcher Meders, filed a petition for rehearing en banc, which under our rules also counts as a petition for panel rehearing.  See 11th Cir. R. 35, I.O.P. 2 ("A petition for rehearing en banc will also be treated as a petition for rehearing before the original panel."); Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1218 (11th Cir. 2017) ("At least until an order granting or denying the petition for rehearing en banc is issued, a panel retains authority to modify its decision and opinion.").

The petition, insofar as it requests panel rehearing, is granted to the extent that we vacate our earlier opinion, Meders v. Warden, Ga. Diagnostic Prison, 900 F.3d 1330 (11th Cir. 2018), and issue this one in its place.

The petition for rehearing en banc remains pending.  In light of the issuance of this revised panel opinion, the Appellant is granted 21 days to file a supplement to his petition for rehearing en banc, if he wishes to do so.  See Fed. R. App. P. 40(a)(4)(C); cf. CSX Transp., Inc. v. Ala. Dep't of Revenue, 888 F.3d 1163, 1188 n.14 (11th Cir. 2018).  He is not required to file a supplement.  If he does file one and the Court desires a response from the Appellee, one will be requested.

Our revised opinion follows:[1]

---

[1] Our only revisions involve Part II of the opinion.  We have removed the seven paragraphs of the former opinion beginning with:  "The Georgia Supreme Court denied Meders' . . ." and ending with "hearing in the state trial court on remand."  In their place we have added the 10 paragraphs beginning with:  "The Georgia Supreme Court denied Meders' . . ." and ending with "that are relevant to the ineffective assistance of counsel claims."

Jimmy Fletcher Meders, a Georgia prisoner, filed a 28 U.S.C. § 2254 petition in the Southern District of Georgia raising 18 claims. After the district court denied his petition, Meders moved for a certificate of appealability on several of his claims. The district court granted that motion only as to his claim alleging that trial counsel was ineffective at the guilt phase of his trial. This is his appeal.

## I. BACKGROUND

### A. Facts

The facts that follow in these two paragraphs are not disputed. On October 13, 1987, Meders went to help his boss, Randy Harris, fix a car at Harris' house. Bill Arnold and Greg Creel later arrived at the house. Arnold is Harris' cousin, and Creel is Arnold's friend. Meders, Harris, Arnold, and Creel spent the afternoon drinking beer and liquor. The four of them went to a Best Western motel later that evening, where Harris had rented a room for a young woman with whom he was having an extramarital affair. Meders, Arnold, and Creel left the motel later that night.

Around 2:35 the next morning (October 14), the three men stopped by a Jiffy Store. Don Anderson, the store clerk, was shot twice — once in the chest, once in the head — and he died. The weapon used in the shooting was a Dan Wesson .357 Magnum revolver. Meders took between $31 and $38 from the cash register. Included in the cash taken were two $1 bills and a $5 bill that the store

3

manager had planted as bait money — she had written down the three bills' serial numbers and kept them in the store's records so that the money could be identified if the store was robbed and the money was recovered. That bait money and some food stamps were found in Meders' wallet and in his house after he was arrested later that same day. The murder weapon was found under his bed two days later.

## B.  The Trial

Meders was indicted in Georgia state court in December 1987 for the murder and armed robbery of Anderson, the store clerk. The case proceeded to a jury trial.

### 1.  The State's Witnesses

Because the claim Meders presses in this Court involves the trial testimony of several of the State's witnesses, we recount their testimony in some detail.

The State first called Harris to the stand. He testified that he spent the afternoon of October 13 drinking with Meders, Arnold, and Creel. He paid Meders about $200 for his work on a car, and while they were sitting around drinking and talking, Meders kept mentioning that he owed some people in Florida $2,000 for some drugs, and that they were "going to come down here and kill him if he didn't pay them."

Harris testified that later that evening all four men went to a Best Western motel. They continued to drink, "smoked a joint or two," and sat around talking in the motel room. Meders, Arnold, and Creel left the motel around 8:30 p.m. but

Meders returned to it around 3:15 a.m. After he did so, according to Harris, Meders pulled out a revolver and told him: "I just blowed a man's head off over $38.00." Harris thought he was joking, so Meders threw some cash and some "little white pieces of paper" about "the same size [as] a dollar bill" on the bed. Meders also opened the revolver's chambers and dumped the bullets on the bed. Harris said that two of the bullets had been "freshly fired." He testified that Meders picked up the cash and the pieces of paper, put them back in his pocket, and left the motel.

Harris testified that around that same time, Arnold called his motel room and asked Harris to pick up Creel and him from a trailer park. Harris drove Creel's truck to the trailer park, picked up both of them, and took them to Harris' house. After arriving at his house around 4:00 or 5:00 a.m., Harris urged the two of them to go to the police and report what had happened. He testified that the three of them talked for about an hour and then all three went to sleep at his house. Around 9:00 a.m., Harris woke up and went to his shop; the police questioned him there and then took him to the police station for more questioning.

Creel testified next for the State. He stated that he, Harris, Arnold, and Meders had spent the afternoon of October 13 drinking before going to the Best Western later that evening. After spending a few hours in the motel room, he, Arnold, and Meders left and went riding around, stopping at a couple of bars.

5

Arnold was driving, Meders was in the passenger seat, and Creel was in the back seat. They later stopped at a Jiffy Store because Creel was hungry. He testified that both he and Meders got out of the car and went into the store. Once inside, Creel grabbed a Yoo-hoo and a package of sausage and biscuits. While he was heating up his sausage and biscuits in a microwave in the back of the store, he heard a gunshot. He turned around and saw the store clerk falling against the wall and Meders facing the wounded clerk.

Creel testified that he "tore out" of the store, and as he was running out, he heard a second gunshot. He exited the store, jumped in the back seat of the car, and told Arnold to "go" because Meders had "just shot a man." He recounted how Meders had run out of the store, jumped in the front passenger seat of the car, and pointed his gun at Arnold and Creel. Arnold drove to Shady Acres, a trailer park, where he and Creel got out. Meders got in the driver's seat, and Arnold told Meders "to never come around him again." Meders asked Arnold and Creel if they wanted any of the money or food stamps he had taken from the store. They both said no, that they didn't want any part of it. Creel and Arnold then walked to one of the trailers where they called Harris to pick them up. Creel testified that he didn't know Meders until the day before the shooting, that he didn't know that Meders had a gun until the shooting, and that he had no idea that Meders was

6

going to rob the store or shoot the clerk.  He also stated that he had given the police

two statements about the incident:  one on October 15, and one a few weeks later.

On cross-examination Creel confirmed that, after they all were finished

drinking at Harris' house, they did not take Meders back to his house but instead

went to the Best Western.  For that reason, Creel thought Meders "must have" had

the gun on him during the afternoon of October 13.  Defense counsel also asked

Creel whether he shot at a couple of trucks while they were riding around that

evening.  Creel testified that he did not — that he didn't even know Meders had a

gun until the shooting inside the store.

The State next presented Arnold, who is Harris' cousin.  For the most part

Arnold's testimony tracked Creel's.  Arnold testified that he had grown up with

Creel and that he had known Meders for about "a year or two" before the shooting.

Arnold told how, after the four of them spent the afternoon of October 13 drinking,

they all went to a room at the Best Western, and later he, Creel, and Meders left

(without Harris) to go riding around.  In the early morning hours of October 14,

they stopped at a Jiffy Store because Creel was hungry and Meders wanted some

cigarettes.  After Arnold parked the car, Creel and Meders both went inside the

store.  The next thing Arnold heard was a gunshot, and the next thing he saw was

Creel running out of the store.  Then Arnold heard another shot, and Creel jumped

in the car and "hollered that Jimmy [Meders] had just killed that man."  Meders

7

then jumped in the car, waved his gun around and pointed it at Arnold and Creel, and told Arnold to drive off and "get away from the store."

Which Arnold did.  He drove them to the Shady Acres Trailer Park, where he and Creel got out of the car and refused to take any of the cash Meders had stolen.  Meders got in the driver's seat and drove off, while Arnold and Creel went into a friend's trailer and called Harris and asked him to pick them up.  Arnold testified that Harris picked them up and they all went to Harris' house, where he told them that they should go to the police.  Instead, the three went to sleep.  Arnold went to the police station the next morning, October 15, to give a statement.

On cross-examination Arnold testified that he did not take Meders back to his house in the hours before the shooting but that they did stop by a bar while they were driving around.  He stated that no one in the car had "shot at a truck" while they were driving around.

Margaret Clements, who was the manager of the Jiffy Store at the time of the shooting, was the next witness for the State.  She testified that a couple of days before the shooting she had recorded the serial numbers from a $5 bill and two $1 bills, and that those three bills were put in a money clip in the register to use as the store's "bait money."  When the bait money was removed from the register, it would trigger a silent alarm.  She said that when she went to the store after the

8

shooting, between $31.00 and $38.00 — which included the $7.00 in bait money — had been taken from the register, but she couldn't determine how many food stamps were taken. She also testified that a receipt was left sticking out of the register, which showed a transaction for 51 cents at 2:35 a.m. on October 14, 1987.

The State then presented several witnesses who testified about the scene of the crime, the evidence related to the crime, and the police department's investigation of the crime.[2] Among them was Charles Byerley, an investigator with the county police department, who testified about the evidence found during the search of Meders' house. He and two other officers found a holster containing several rounds of .357 Magnum bullets. They also found a dollar bill that was torn in half sitting on top of a television in the house. Byerley testified that the torn dollar bill had the same serial number as one of the $1 bills from the Jiffy Store's bait money. He also stated that after Meders was arrested later that day, he had inventoried Meders' wallet and found $82 in cash, as well as some food stamps.

---

[2] Abe Brown, the Glynn County coroner, and David Griffin, the county medical examiner, testified about Anderson's gunshot wounds and the cause of his death. Charlie Beasley from the Glynn County Police Department's evidence and investigation unit testified that he secured the evidence from the crime scene and a few days later he delivered it to Roger Parian, a firearms examiner from the Georgia Bureau of Investigation. Parian testified that, based on the evidence from the crime scene, the two .357 Magnum bullets recovered there came from the Dan Wesson .357 revolver that Beasley had provided to him.

Greg McMichael, a Glynn County police officer at the time of the shooting, testified that when he responded to the call at the Jiffy Store, he passed a car with several occupants driving away from the location of the Jiffy Store. And Matthew Doering, a detective from the Glynn County Police Department, testified that on October 14 he found that same car at Meders' house. After impounding it, he searched the car and found a "Dandy Sausage Biscuits" wrapper.

The serial numbers of a $1 bill and a $5 bill from Meders' wallet matched the serial numbers of the other $1 bill and the $5 bill from the bait money.[3]  A Georgia citation for the sale of cocaine was also found in Meders' wallet and it was admitted into evidence.

The State called Jack Boyet as its last witness.  Boyet was a detective with the Glynn County Police Department at the time of the murder.  He responded to the scene at the Jiffy Store and also went with two other officers to Meders' house later that morning to question him.  At the house Boyet told Meders that he had some questions about a homicide at the Jiffy Store, and Meders falsely stated that he didn't know anything about it.  Boyet then asked Meders whether he had a gun or knife on him, and Meders admitted that he did.  The officers took a "small .22 pistol," which was loaded and had a shell in the chamber, from the right pocket of his jacket.  They also found 17 food stamps in the left pocket of Meders' jacket.  After reading him his Miranda rights, Boyet asked him if he had any other firearms in the house, and Meders said he had a .357 revolver.  The officers obtained that firearm (a fully loaded Ruger Black Hawk .357 revolver) and the .22 pistol and took Meders to the station for more questioning.

---

[3] Neal Harrell, a special agent with the Georgia Bureau of Investigation, testified that he went with Byerley to Meders' house around 11:15 a.m. on October 14, and confirmed that he and Byerley discovered the evidence that Byerley testified about at trial.

Detective Boyet told the jury that at the police station Meders again stated that he didn't know anything about the robbery-murder and had not gone to the Jiffy Store. He claimed, instead, that he had been at the Best Western and had gone home around midnight. Boyet then informed Meders that Harris had just given a statement to detectives that Meders had told him that he "had blew a man's head off for $38.00." Meders denied saying that and told Boyet that Harris was "trying to get him" because he thought Meders was having an affair with his wife. After Boyet finished interviewing him, Meders was arrested.

Boyet testified that on October 16, Harris came to the police station and said that he "had received information" that the gun used in the shooting was under Meders' waterbed. Boyet executed a search warrant at Meders' house that day and found a Dan Wesson .357 Magnum revolver "under the center of the [waterbed's] mattress." The firearms examiner later concluded that the revolver had fired the two bullets that killed the Jiffy Store clerk.

Boyet also testified that on November 14, 1988 — a year and one month after the murder and Meders' first statement to police, and four months before the trial — Meders asked to talk with him again. Despite his previous statements denying that he knew anything about the crime, Meders now told Boyet a different story. Here's how Boyet recounted on the witness stand Meders' new story:

> He said that he first got with Bill Arnold and Greg Creel on the afternoon of October 13th, 1987. . . . They drank beer, smoked several

11

joints, got high, got drunk, and they [ ] went to a motel room where Randy Harris was [ ] with a girl. . . .

They rode around that afternoon and took him home. He was drunk, passed out on the couch. Around 11:00 [p.m.] they came back to his house. Bill Arnold woke him up and told him they needed him to go with him, and to bring his gun. He told the[m] he didn't want to go, said we need you to go, get your gun and come with us, said he got his gun, the Dan Wesson revolver out from under the couch, got in the car with them. At that time they went to the Best Western Motel where Randy and Sandra Ruggles were at. At that point [Harris] and [Arnold] got over in the side of the room, were whispering low voices. He couldn't understand what they were saying. [Arnold, Creel, and Meders] then got in the Roadrunner and left, went riding around, rode around the County. At one point Bill Arnold took the gun, the Dan Wesson, and shot at a truck. They shot at a . . . flower shop . . . on 303, shot a new Chevy truck somewhere on 303. They passed a young man by the name of Keith Bowen on Community Road. [Arnold] asked [Meders] to shoot [Bowen], or give him a gun, he would shoot him, and [Meders] said he got scared and told him he was crazy, and they kept riding. Said they rode several hours still drinking. They pulled into the Jiffy Store to get something to eat at Marshes of Mackay. All three went in. He said Creel went to the back, got something, put it in a microwave oven. He stayed up by the counter, didn't go any further because he was drunk. Said at that time Bill Arnold pulled out the gun, shot the man, that he fell. He shot him again, and [Meders] said he told him, you shot that man. He said [Arnold] laughed, and said, yes, no witnesses, get the money. Then he said he then took the money out of the cash register. They got in the car and left. After leaving there, they went to Shady Acres Trailer Park. . . . [Creel] and [Arnold] got out of the car there, left him with the car, said he left the gun with [Arnold]. He drove directly home, did not go anywhere, and went to bed.

Meders also told Boyet that he did not go to Harris' motel room after the murder, that Harris had told him later that morning that the best thing he could do is keep his mouth shut about the shooting, and that Harris had put the gun under Meders' mattress. Boyet testified that Meders said he had waited more than a year to tell

12

the police about the incident because he was scared of what would happen if he told them. Boyet confirmed that he had not found any evidence that Arnold or Creel ever had the gun that killed the store clerk, or any evidence that corroborated Meders' story about what had happened.

Defense counsel then cross-examined Boyet. Boyet stated that when he questioned Creel and Arnold on October 15 about whether they had shot at a truck as they were riding around during the night of October 13, they both denied it. Defense counsel then asked: "And did you have any reason to, to doubt that they were telling you the truth?" Boyet responded: "The only thing I had to indicate that they did do it was, is Jimmy Meders saying that they did." He added: "There, there is no other evidence to indicate that they did. There, there are no witnesses that saw it other than the, the three who were allegedly in the [car], and I have no proof that they did do it."

## 2. The Defense Witnesses

The State rested, and the defense presented its case. Five witnesses testified for the defense before Meders himself took the stand. His wife Sherry testified that Meders had passed out from drinking around 10:00 p.m. on October 13, 1987, that Arnold came inside their house later that night asking to borrow a gun, and Meders left the house with him. On cross-examination Sherry Meders admitted telling officers on October 14 that she did not know whether her husband had left the

13

house during the previous night and that she did not tell them that Arnold came by the house to pick up Meders or Meders' gun. She had told the police that Meders had, among other guns, two .357 caliber guns in the house. She testified that she never told Harris that the murder weapon was under Meders' waterbed.

Wayne Martin, a friend of Meders, testified that after going by the Best Western for about 10 minutes on the night of October 13, he and Meders went to Meders' house to drink some beer. He stated that when he left around 10:00 p.m. Meders was "passed out . . . on the couch." Martin stated that a couple of months after the shooting, Meders told him that he had been with Arnold and Creel at the time of the shooting, that they had his gun, but that he didn't remember what happened during the shooting.

Meders' brother and his brother's wife both testified that they saw Meders around 2:25 a.m. on October 14, that he was with Arnold and Creel then, and that the three men had a gun in the car. His brother also stated that about six to seven months after the shooting, Meders told him that either Arnold or Creel had shot the clerk. Another witness testified that he saw Arnold at a bar around 5:00 or 6:00 p.m. on October 14, the day of the murder, and that Arnold told him and a few others that he had to go see Harris and Creel to "see what the deal was" and "get the story straight."

14

Finally, Meders testified on his own behalf.  He said that during the afternoon of October 13, 1987, he and Harris took two 10 milligram Valiums each and drank some beer at the auto shop before Arnold and Creel met them at Harris' house, where they all drank some more.  He stated that Harris gave him $250 for some work he had done on a car, and Harris also bought a bulldog from Creel for $50.  Meders testified that he, Arnold, and Creel "felt like getting drunk" so they went to the liquor store and bought some alcohol.  Around 5:30 p.m., Meders felt like he had "had enough to drink," so he stopped drinking — at least for a little while.  He said that Harris then told him, Arnold, and Creel that he had to go pick his wife up from work, so Arnold and Creel drove Meders home.

Meders testified that later that night, his friend Wayne Martin took him to the motel room that Harris had rented.  Meders and Harris talked for a little while, then Martin took Meders back home, where Meders drank some beer and passed out on the couch.  The next thing Meders recalled was Arnold waking him up around 11:00 or 11:30 p.m. insisting that he "go with him."  Arnold picked him up under the arms, and then as they were leaving Meders' house Arnold grabbed the Dan Wesson .357 Magnum, which was the murder weapon.  They got in the car with Creel and went to Harris' motel room.  Meders testified that after leaving the motel, Arnold drove Creel and Meders by two houses.  He said that Arnold and Creel had gotten in a fight with some people (one of whom was a man named

15

Keith Bowen) and "wanted revenge," and as the three men were driving by those two houses, Arnold fired Meders' gun twice — once at a dark truck parked at one house, and the other time at a white truck parked at the other house. Meders then told Arnold to take him home because he didn't want to be involved in any trouble.

According to Meders, Arnold did not take him home but instead drove to a convenience store. After that Meders started driving the car, and as he was heading back to his house, he saw his brother and his brother's wife making a deposit at a bank "right around the corner from [his] house." When they stopped at the bank to talk to Meders' brother and sister-in-law, Arnold got back in the driver's seat. They then drove to another convenience store, and Arnold went in with Meders' gun in his pocket while Creel and Meders sat in the car. Meders testified that they thought Arnold was just "kidding" around by taking the gun inside.

Meders testified that after Arnold returned to the car, he drove to the Jiffy Store, and all three men went inside. Meders testified that he and Arnold were standing near the counter while Creel went to the microwave. He stated that out of nowhere, Arnold "pulled the gun and shot" the clerk twice, then told Meders: "No witnesses. Get the money." Meders grabbed the money out of the cash register, and the three men exited the store "pretty quickly," got in the car, and Arnold drove to Shady Acres Trailer Park, where he and Creel got out. Meders told

16

Arnold to keep the gun, that he didn't want it back, and then he drove back to his house. He testified that after getting to his house, an officer pulled up and told him that he had a brake light out. Meders went inside and went to sleep on the couch.

Later that morning Harris came by Meders' house and told him to "go on to work" and that he would be there shortly. Meders testified that Harris later told him at the shop that he should keep his mouth shut and "let [it] blow over" because Meders had a wife and child to take care of. Meders went back to his house, and several officers showed up. He told the officers multiple times that he did not know anything about the shooting, which he admitted at trial was not true. Meders went to the police station around 11:15 that morning and, as he claimed that Harris had advised him, told the officers again that he did not know anything about the robbery-murder.

Meders acknowledged at trial that he did not tell Detective Boyet that he witnessed the shooting until more than a year after the murder. He also conceded that although he did not know how the torn $1 bill from the bait money ended up on his television, the officers did find the other two bills of the bait money (the $5 bill and the other $1 bill) in his wallet. And he acknowledged that the officers found the murder weapon under his bed after Harris told them on October 16, 1987, exactly where to find it. He claimed that he had no idea how the firearm got there.

17

### 3.  The State's Rebuttal Witnesses

Harris and a Brunswick City police officer testified in rebuttal for the State. Harris admitted that he had previously pleaded guilty to selling marijuana.  He also testified that it was Meders' wife Sherry who had told him where the murder weapon was.

The city police officer testified that around 3:30 a.m. on October 14, 1987, he saw a vehicle speeding about a quarter mile from Meders' house, and he later located that vehicle at Meders' house.  After he stopped in front of the house Meders came out to see "what was wrong."  The officer asked Meders if he had been driving the vehicle, and Meders, who was acting "very, very nervous," told the officer that he had just driven it back from the Amoco station where he had called his girlfriend, and that he was nervous because his wife "would kill him" if she found out that he had a girlfriend.

### 4.  The Closing Arguments

The State waived its opening argument to the jury but reserved the right to conclude.  Defense counsel argued in closing that the State had allowed Harris, Arnold, and Creel to "design its case," and he pointed out inconsistencies between their testimonies.  He told the jury that he didn't believe the "Arnold-Creel-Harris version of this case speaks the truth" and argued that Harris planted the murder weapon under Meders' bed.

18

The State told the jurors in its closing argument that they would have to judge the credibility of the witnesses, and that "Randy Harris, Bill Arnold, Greg Creel, [and] the police officers all told the same story all the way down the line from day one." It argued that Meders, his wife, and Martin had made up their stories about a year after the incident. And it noted that Meders had never explained what he did in the "twenty-five minute[ ]" gap between leaving the Shady Acres Trailer Park and arriving at his house. The State argued that what he had done was stop by the Best Western and tell Harris what he had done, just as Harris had recounted to the jury. The State pointed out that Meders had several opportunities to tell the police what he knew about the crime, but he failed to do so until more than a year after the murder — unlike Harris, Arnold, and Creel.

### 5. The Jury Verdict and Sentence

During its deliberations, the jury asked six questions, three of which Meders discusses in his briefs to this Court:

> During the execution of the first search warrant, was the bedroom searched, if so was the waterbed searched?
>
> Can fingerprints be taken and if so were they taken on the waterbed mattress??
>
> [Were] there any reports filed on the incident of the truck, on Ga Hwy 303, [r]eported between the day after or between then and now, being shot at??

The court told the jury that it could not "respond to you in any regard concerning the evidence in this case," and that the jury must base all of its findings on the

19

evidence that had been presented to it.  After two hours of deliberations, the jury

returned a guilty verdict on the charges of malice murder and armed robbery.

Meders was sentenced to death for the murder offense and to a consecutive life

sentence for the armed robbery offense.  (There are no sentence stage issues in this

appeal.)

### C.  The Direct Appeal and Remand Proceedings

Meders appealed his convictions and sentences to the Georgia Supreme

Court.  See Meders v. State, 389 S.E.2d 320 (Ga. 1990).  Although his trial counsel

initially represented him in the appeal, other counsel appeared for him and filed a

new brief on his behalf that "raised questions about the effectiveness of trial

counsel."  Id. at 324.  Because the ineffective assistance of trial counsel was raised

for the first time on appeal by Meders' new attorney, the Georgia Supreme Court

granted the State's request to remand the case to the trial court for a hearing on that

issue.  Id. at 325.  Before doing so, it rejected all of Meders' other claims of error.

Id. at 321–24.

At the remand hearing Meders contended that his trial counsel was

ineffective during the guilt phase for:

> [1] failing to use police incident reports found in the prosecutor's open
> file and failing to develop testimony of the shootings near Highway 303
> that corroborated [his] trial testimony and impeached the testimony of
> the State's key witnesses; [2] failing to utilize prior inconsistent
> recorded statements of the State's three eyewitnesses found in the
> prosecutor's open file; [3] failing to object to the admission of an

20

unadjudicated citation for cocaine sales; [and] [4] failing to object to the admission and use of food stamps based upon a note in the prosecutor's open file that the food stamps could not be linked to the robbery.

The evidence presented at the hearing included the complete files of the prosecutor and of Meders' trial counsel as well as documents from the Glynn County Police Department relating to Meders' case.

The prosecutor's file contained pretrial statements from Harris, Arnold, and Creel, including transcripts of Harris' October 14, 1987 interview and of Arnold's and Creel's October 15 interviews. There were several inconsistencies between those pretrial statements and trial testimony. For example, in their pretrial statements Arnold and Creel told the police that they had taken Meders home and picked him up on the night of October 13, but in their trial testimony they denied doing that. Creel's pretrial statement showed that he told the police he knew Meders had a gun when Meders went into the Jiffy Store, but he testified at trial that he did not know about the gun until Meders actually shot the clerk.

A report prepared by Boyet shows that when the police went to Harris' body shop around 11:00 a.m. on October 14, Harris told them that he had not seen Meders since the night before and he did not say anything about the shooting or Meders' involvement in it. But at the police station just over an hour later, Harris told the police that Meders had stopped by his motel room around 3:00 to 4:00 that morning and told him that he had just "killed a man over $38." Harris also told the

21

officers that Meders did not say where (that is, in what part of the body) he had shot the clerk but "just [that] he shot him." At trial Harris had testified that Meders stopped by his motel room around 3:15 a.m. and told him that: "I just blowed a man's head off over $38.00."

The pretrial statements also show that Harris told the officers on October 14 that he had no idea where Meders would keep the murder weapon. Two days later he told Boyet that he "had been thinking about it and the only place he could think of where Meders would have hidden the gun he used was the water bed in Meders['] bedroom." At trial, however, he had testified that Meders' wife Sherry had told him where the gun was located.

The prosecutor's file also contained two police reports that supported Meders' trial testimony about the truck shootings and contradicted the testimony of Arnold, Creel, and Detective Boyet on that subject. One police report stated that around 12:30 a.m. on October 14, a car passed by the complainant's house several times and someone in the car "fired a shot" on the last pass. The bullet struck the wall near the house, missing the truck parked in the driveway "by about a foot." The complainant's son was Keith Bowen — the same person that Meders testified had been in a fight with Arnold and Creel. See supra at 16. The other report stated that around 1:30 that same morning, someone "fired a round" at the complainant's truck, and that the complainant "feels that the incident was caused by Larry

22

Brockington and Greig [sic] Creel due to some problems he has had with them in the past."

Finally, the prosecutor's file also contained a note that stated "[u]nable to trace any food coupons to store," as well as a report by a Glynn County police officer stating that Sherry (Meders' wife) had told the officer that she and Meders were legally receiving food stamps. Less favorable to Meders, that same report indicated that during the first search of Meders' house the officers had looked "around the bottom outside area" of the waterbed but not underneath it.

In addition to that evidence, Meders presented twelve witnesses at the remand hearing.[4] His counsel at the hearing questioned several of those witnesses about the shootings involving the two trucks and about the witnesses' relationships with Meders, Arnold, or Creel. One witness — the owner of one of the trucks — testified that he had a bad relationship with Creel, and another witness testified that the officer who took the police report about one of the truck shootings told her that the bullet from the truck shooting "was the same type [of] bullet that had killed" the Jiffy Store clerk.

Meders' counsel also questioned Boyet about the police reports and the inconsistencies between the pretrial statements and the trial testimony of Harris,

---

[4] Because Meders' trial counsel was hospitalized shortly before the remand hearing, he could not be called as a witness. Nor could he be called as a witness in the later state habeas proceedings because he died before they began.

Arnold, and Creel.  Boyet confirmed that before the trial he had talked to Arnold and Creel about the truck shootings and that they both had denied any involvement in them.  Boyet conceded that he was unable to link to the Jiffy Store any of the food stamps that were admitted into evidence, he had never testified he could.

No copies of the pretrial statements of Arnold, Creel, or Harris were found in Meders' trial counsel's file.  And nothing in his trial counsel's file suggested that he had reviewed those witnesses' pretrial statements.  Nor did his file contain copies of the police reports.  Based on the evidence presented at the remand hearing, Meders argued that his trial counsel was ineffective for failing to use the pretrial statements and police reports to corroborate Meders' testimony and "undercut the credibility of the [State's] prime accusers against [him]," and for failing to object to the admission of the food stamps and the citation (that was found in his wallet) for the sale of cocaine.  He contended that those failures prejudiced him, and he asked for a new trial.

The state trial court ruled that Meders had failed to show that he was prejudiced by his trial counsel's alleged deficiencies.  As a result, it denied his claim that his counsel was ineffective during the guilt phase of his trial.  The Georgia Supreme Court affirmed.  Meders v. State, 411 S.E.2d 491 (Ga. 1992).  As to Meders' ineffective assistance claim, the Georgia Supreme Court's ruling stated in its entirety:  "The trial court's nine-page order persuasively demonstrates that

24

Meders has failed to overcome the strong presumption that Meders' trial counsel performed effectively." Id. at 492 (quotation marks omitted). The United States Supreme Court denied Meders' petition for a writ of certiorari. Meders v. Georgia, 506 U.S. 837, 113 S. Ct. 114 (1992). That ended the direct appeal.

## D.  The State Habeas Proceedings

A couple of years later, in April 1994, Meders filed a state habeas petition. After conducting evidentiary hearings, the state habeas court granted relief on Meders' claim alleging ineffective assistance of counsel at the guilt phase, but it denied relief on his other claims. The State and Meders both appealed. The Georgia Supreme Court reversed the grant of relief on Meders' ineffective assistance claim, explaining that the claim was procedurally barred because it had already been litigated on the merits in the direct appeal. Schofield v. Meders, 632 S.E.2d 369, 372 (Ga. 2006); see id. at 373 ("The record in this case clearly establishes that the habeas court granted relief on claims that had been raised in essentially the identical form in the hearing held on remand to the trial court."). It affirmed the state habeas court's denial of relief on the other claims and reinstated Meders' convictions and sentences. Id. at 372.

## E.  The Federal Habeas Proceedings

Meders filed a 28 U.S.C. § 2254 petition in July 2007 and an amended petition in January 2012. The district court ruled that Meders' trial counsel's

25

performance at the guilt phase was deficient but concluded that the trial court's ruling on remand in the direct appeal that Meders could not establish prejudice was not an unreasonable application of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). See 28 U.S.C. § 2254(d)(1). On that basis it denied his petition. Meders later moved for a certificate of appealability on several claims, and the district court granted one on a single general issue: whether Meders' trial counsel was ineffective during the guilt phase of his trial.

## II. DISCUSSION

For a third of a century it has been established that counsel does not render ineffective assistance unless he performs outside "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Even then, the claim is not established and no relief is due unless the petitioner affirmatively proves that the errors of counsel had not just "some conceivable effect on the outcome of the proceeding" but "that they actually had an adverse effect on the defense." Id. at 693, 104 S. Ct. at 2067.

As for how adverse, and how likely, the effect of the attorney's errors must be: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068; see also Harrington v.

26

Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 792 (2011) ("The likelihood of a different result must be substantial, not just conceivable.").

As difficult as it is to prevail on an ineffective assistance prejudice issue in the first court to decide it, the Antiterrorism and Effective Death Penalty Act of 1996 makes it even harder to succeed on that issue in a federal habeas proceeding after a state court has ruled that the petitioner failed to show prejudice.  To obtain habeas relief, the petitioner must show that the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[5]  That is a highly deferential standard that is intentionally difficult to meet.  See Harrington, 562 U.S. at 102, 131 S. Ct. at 786; Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1107 (11th Cir. 2012); see also White v. Wheeler, 577 U.S. __, 136 S. Ct. 456, 460 (2015) ("This Court, time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.") (quotation marks omitted).

---

[5] A petitioner may, of course, also prevail under AEDPA by showing that the state court's ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). Because Meders makes no argument under that alternative provision, we will not discuss it further.

Under AEDPA, error is not enough; even clear error is not enough.  Virginia v. LeBlanc, 582 U.S. __, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quotation marks omitted).  To overcome AEDPA deference under § 2254(d)(1), the petitioner must "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id.  "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."  Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012) (quotation marks omitted).

The Georgia Supreme Court denied Meders' guilt stage ineffective assistance of counsel claim on the merits.  See Meders, 411 S.E.2d at 492.  It did so in the appeal from the order entered by the state trial court on remand during the direct appeal.  See id.  Because it affirmed on the basis of the trial court's order, see id, we "look through" the Georgia Supreme Court's decision to that trial court order.  See Wilson v. Sellers, 584 U.S. __, 138 S. Ct. 1188, 1192 (2018).

Meders concedes that § 2254(d)(1) deference is due the state trial court's ruling on remand regarding prejudice.  See, e.g., Appellant's Br. at 33 ("The issue

28

in this case, then, is whether the state court's conclusion that Meders failed to prove sufficient prejudice involved an unreasonable application of <u>Strickland</u>, as defined by § 2254(d)(1).").  The measure of deference is whether "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>LeBlanc</u>, 137 S. Ct. at 1728 (citation omitted); <u>Holsey</u>, 694 F.3d at 1257.

"Deciding whether a state court's decision involved an unreasonable application of federal law . . . requires the federal habeas court to train its attention on the particular reasons — both legal and factual — why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision."  <u>Wilson</u>, 138 S. Ct. at 1191–92 (quotation marks and citations omitted).  That does not mean we are to flyspeck the state court order or grade it.  What it means is we are to focus not merely on the bottom line ruling of the decision but on the reasons, if any, given for it.  The bottom line here is the ruling by the state trial court that counsel's failure to use certain pretrial statements of witnesses and police reports coupled with their failure to object to certain evidence did not amount to ineffective assistance of counsel.  The reason the state court gave for that ruling is that there was no reasonable probability of a different result if counsel had acted as Meders claimed they should have.  The reason there wasn't, the court explained, is

29

that the evidence counsel failed to present was cumulative and outweighed by the strong evidence of guilt, and the objections that they failed to make would have been futile or otherwise would have made no difference anyway.  See Strickland, 466 U.S. at 692–96, 104 S. Ct. at 2066–69.

Notwithstanding his concession that deference is due, at other points in his briefs Meders appears to implicitly argue either that deference is not due, or perhaps that deference does not mean much.  He does so by engaging in a line-by-line critique of the state court's reasoning, pointing out evidence that was not mentioned in the state court's order or was not given the weight he feels it deserves.  See, e.g., Appellant's Reply Br. at 7–8 (taking issue with how the state trial court summarized the evidence against him); id. at 16 (arguing that the state trial court's order "gives no indication" that it considered facts brought to light by the impeachment evidence presented at the remand hearing); Appellant's Br. at 36 (arguing that the court focused on the wrong evidence and "failed to consider the most compelling issues framed by the evidence").  That is not the proper approach.

This Court has stressed that in applying AEDPA deference federal courts are not to take a magnifying glass to the state court opinion or grade the quality of it. We have emphasized time and again that we are "not to read state court opinions as if we were grading papers."  Rimmer v. Sec'y, Fla. Dep't of Corr., 876 F.3d 1039, 1055 (11th Cir. 2017) (quotation marks omitted); see also, e.g., Jones v. Sec'y, Fla.

30

Dep't. of Corr., 834 F.3d 1299, 1311 (11th Cir. 2016) ("[W]e have cautioned that overemphasis on the language of a state court's rationale would lead to a grading papers approach that is outmoded in the post-AEDPA era.") (quotation marks omitted); Holland v. Florida, 775 F.3d 1294, 1311 (11th Cir. 2014) ("We do not read state court opinions as if we were grading papers, and must apply AEDPA deference absent a conspicuous misapplication of Supreme Court precedent.") (quotation marks omitted); cf. Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("Reading into the statute a requirement that state courts spell out their rationale would run counter to the main thrust of [AEDPA].").

We have explicitly rejected the proposition that a state court decision involves an unreasonable application of federal law and is not entitled to deference unless that court's opinion on its face "shows its work" by explicitly mentioning "all relevant circumstances" that the defendant argues in support of relief. See Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1211 (11th Cir. 2013). That proposition captures Meders' position. Our rejection of it follows the Supreme Court's teaching that "readiness to attribute error" to a state court decision is incompatible with both "the presumption that state courts know and follow the law" and AEDPA's "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."

31

Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (citation omitted) (internal quotation marks omitted).

The Supreme Court in Wilson held that presumptively we should look through a silent higher state court decision to an explicitly reasoned lower court one in determining the reasons for the decision. Wilson, 138 S. Ct. at 1193–96. But Wilson was about which state court decision we are to look at if the lower state court gives reasons and the higher state court does not. It was not about the specificity or thoroughness with which state courts must spell out their reasoning to be entitled to AEDPA deference or the level of scrutiny that we are to apply to the reasons that they give. Our no-grading-papers, anti-flyspecking rule remains the law of the circuit. See Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1230 (11th Cir. 2007) ("Obedience to a Supreme Court decision is one thing, extrapolating from its implications a holding on an issue that was not before that Court in order to upend settled circuit law is another thing."); Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003) ("While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point.").

After all, the Supreme Court itself has also held that "federal courts have no authority to impose mandatory opinion-writing standards on state courts." Johnson v. Williams, 568 U.S. 289, 300, 133 S. Ct. 1088, 1095 (2013). In so holding, the

32

Court cautioned that "[t]he caseloads shouldered by many state appellate courts are very heavy, and the opinions issued by these courts must be read with that factor in mind." Id. at 300, 133 S. Ct. at 1095–96 (footnote omitted). Not only that, but the Supreme Court has held that AEDPA deference is due even to those state court rulings for which no rationale or reasoning at all is given. See Harrington, 562 U.S. at 100, 131 S. Ct. at 785. It would be irrational to afford deference to a decision with no stated explanation but not afford deference to one that states reasons, albeit not as thoroughly as it could have.

Only the clearest indication that Wilson overruled the Supreme Court's previous decisions, such as Johnson, would warrant ignoring those decisions, and there is no indication at all that Wilson did so. See Hohn v. United States, 524 U.S. 236, 252–53, 118 S. Ct. 1969, 1978 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); Agostini v. Felton, 521 U.S. 203, 237, 117 S. Ct. 1997, 2017 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 1921–22 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should

33

follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Applying AEDPA deference to the state trial court decision that Meders failed to establish prejudice for Strickland purposes, the question is whether every fairminded jurist would conclude that prejudice has been established. See Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) ("To establish prejudice [where AEDPA applies, a petitioner] has to show that every fair-minded jurist would conclude that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (quotation marks omitted).  So long as any fairminded jurist could agree with the state court's ruling, we must deny federal habeas relief.  With that standard of deference in mind, we turn to the facts established at trial and in the evidentiary hearing in the state trial court on remand that are relevant to the ineffective assistance of counsel claims.

A.  Failure to Use the Pretrial Statements and the Police Reports

Meders contends that his trial counsel was ineffective for failing to use certain pretrial statements and police reports to impeach several of the State's witnesses, and that the state trial court's determination that he had failed to establish prejudice "reflects a profound misvaluation of the impeachment material trial counsel failed to use."  The State, while acknowledging that new evidence

34

does call into question "certain areas of credibility" of some of its witnesses, contends that evidence is not enough to repair Meders' credibility or to refute the overwhelming evidence showing his guilt.

As the State recognizes, when read against their testimony at trial, the pretrial statements and the police reports weaken the credibility of Harris, Creel, Arnold, and Detective Boyet. Harris, for example, first told the police around 11:00 a.m. on October 14 that he hadn't seen Meders since the previous night. An hour later he told the police that between 3:00 to 4:00 that morning Meders had stopped by his motel room and told him he shot the store clerk, but said that Meders had not mentioned that he shot the clerk in the head. But Harris later testified at trial that when Meders had stopped by his motel room, Meders told him he had shot the store clerk in the head. He also first told the police he didn't know where the murder weapon was located, then told them two days later that he had remembered Meders liked to hide things under his waterbed "where they would never be found," and finally testified at trial that Sherry Meders had told him that the gun was under the waterbed.

Although it's clear that Harris made inconsistent statements, it's not clear that he was lying about Meders confessing that he had just "blowed a man's head off over $38.00." Harris testified that Meders took $38 — no more, no less — from the Jiffy Store. But there is no evidence that Arnold or Creel knew how

35

much money was taken from the Jiffy Store. And Meders admitted at trial that he had taken the money from the cash register and that nothing was said in the car from "the time we left the store till we reached Shady Acres Trailer Park." So Arnold and Creel could not have told Harris how much money Meders took because they did not know how much money he took. As a result, either Meders told Harris that he took $38 from the store (and lied to Boyet when denying that) or Harris miraculously guessed the precise amount of cash that Meders stole from the store.

In a similar vein, Harris' incentive to lie about who committed the robbery-murder was much weaker than that of Meders, Arnold, or Creel. Arnold and Creel admitted that they were present at the scene of the murder, putting them in some jeopardy of being convicted of that crime. Harris, by contrast, undisputedly was not present during the crime, nor was there any evidence suggesting that he knew it was going to happen. No matter whose version of the events the jury found was true, Harris did not face conviction for the capital crime of robbery-murder and a death sentence. And a rational jury in deciding whether to believe him or Meders would take into account that he had far less incentive to lie than Meders, who was facing a death sentence, did.

Still, Harris could have been impeached with the evidence Meders' trial counsel did not present. And Arnold, Creel, and Detective Boyet also could have

36

been impeached with the evidence that was not presented.  Arnold's and Creel's

pretrial statements contradicted some of their testimony at trial.  The police reports

from the prosecutor's file not only undermined the testimonies of Arnold, Creel,

and Boyet about the truck shootings but also supported Meders' testimony about

those shootings.  And the jury's question about whether any reports were filed

about the truck shootings suggests that it was interested in that subject.  The jury

questions about whether the waterbed was searched when officers first searched

the house and whether fingerprints were lifted from it suggest that the jury was

also interested in that.

Despite all of that, there was still undisputed evidence in the record pointing

to Meders' guilt.  For example, the two bullets that struck the victim were fired

from the Dan Wesson .357 Magnum revolver that was found under Meders'

waterbed.  Meders even confirmed at trial that the .357 Magnum "was the weapon

that was used to kill the [store clerk]."  He acknowledged that he owned that

weapon, and there was no evidence that anyone had planted it under his waterbed.

The undisputed facts about what happened to the proceeds of the robbery are

strong evidence of Meders' guilt.  After all, he admitted to the jury that he was the

one who took the money from the Jiffy Store:  "I got the money out of the cash

register."  And he was the only one who kept any of that money.  The Jiffy Store's

bait money was found in his possession.  Meders admitted that two of the three bait

37

money bills were found in his wallet.  The third bait bill was found on his television.  If, as Meders claimed in his testimony, Arnold actually shot the store clerk during the robbery, it seems highly unlikely that Arnold would not have ended up with any of the stolen money.  Meders testified that after the crime, he insisted that Arnold keep the firearm that belonged to Meders because he "didn't want it back," but he never explained why he didn't insist that Arnold take the cash, which was the proceeds of the crime.

That the murder weapon was found under Meders' waterbed evidences his guilt.  And even if we assume that it was put there by someone other than Meders, as he implied at trial, the fact remains that he admitted to owning the weapon that fired the bullets that killed Anderson.  He admitted to being present at the scene of the crime.  And he admitted to having in his possession all of the money taken from the cash register.  And although the evidence that trial counsel did not present would have been helpful in impeachment, none of it substantially undermined the proof of Meders' guilt.  Whether Arnold and Creel shot at the trucks and whether they dropped Meders off at his house at some point before the murder does not change the undisputed facts that point to Meders' guilt.  The evidence establishing that Meders committed the murder remains strong.

Even though the police reports corroborated some of Meders' testimony, the reports would not have repaired his credibility.  Meders lied to the police several

38

different times, and he acknowledged as much at trial. He testified that he told the officer who pulled up at his house after the shooting that he had just gone to call his girlfriend and he was nervous because his wife would kill him if she found out. That was a lie, as Meders admitted at trial. And when police officers questioned him at his house hours after the murder, he told them he did not know anything about the shooting. That was also a lie, as Meders admitted at trial. Hours later at the police station, he again told Detective Boyet he knew nothing about the shooting. Same lie retold, as Meders later admitted at trial.

A year and a month after his arrest Meders reversed a year-long course of lies and admitted to Boyet that he was with Arnold and Creel at the Jiffy Store at the time of the murder. He attempted to explain away his previous lies about that by saying he had simply been following Harris' advice to deny any involvement in the crime.[6] He was the only one out of the three men involved in the crime who initially denied having any knowledge of it to persist in that lie for more than a year. Meders also lied to the police about the murder weapon. When asked at the

_____

[6] That Meders would follow Harris' advice is hard to square with his purported belief that Harris was out to get him for allegedly having an affair with Harris' wife.

Meders argues that in a contest of credibility a jury should not believe Harris' testimony incriminating him because Harris initially failed to mention to the police anything about Meders' involvement in the murder but an hour later told them that Meders said he had "killed a man over $38." If Harris' "lie," which he corrected within an hour, supplies "good reason to doubt" his testimony, Meders' lies about having no knowledge of the crime, which he failed to correct for 13 months, give bountiful reason to doubt Meders' testimony and decide the contest of credibility in favor of Harris.

39

police station the day of the robbery and murder what firearms he owned, he listed several guns, failing to mention only one — his Dan Wesson .357 Magnum that was the murder weapon.

Meders has failed to show that had his trial counsel used all of the impeachment material during the guilt phase of his trial, every fairminded jurist would conclude that there is a "substantial, not just conceivable," likelihood that the result of his trial would have been different.  See Harrington, 562 U.S. at 112, 131 S. Ct. at 792.  We are not convinced that every reasonable jurist's confidence in the outcome of the trial would have been undermined.  See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  The state trial court's prejudice determination was not unreasonable.

### B.  Failure to Object to the Food Stamps and the Cocaine Citation

Meders also argues that trial counsel's failure to object to the introduction of evidence that he had food stamps or to argue to the jury that they could not be linked to the robbery also amounted to ineffective assistance.  The Jiffy Store manager testified that food stamps were taken from the store, although she could not say how many food stamps were taken.  And on the witness stand, Meders conceded that food stamps were found in his jacket just hours after the crime.  In addition, Creel testified that after they got to the trailer park minutes after the

40

shooting, Meders tried to give him and Arnold some of the food stamps that he had taken from the store.

Given all of that testimony, there was enough evidence to link the food stamps to the robbery. They were admissible and an objection to them would have been futile. The state court found that counsel's failure to object to the introduction of the food stamps was neither deficient performance nor prejudicial. That is not only reasonable but also correct. It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained. See Green v. Georgia, 882 F.3d 978, 987 (11th Cir. 2018) (holding that the petitioner could not possibly have suffered Strickland prejudice where the objection that was not made would have been futile); Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1297 (11th Cir. 2017) (stating that "an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief").

As for counsel's failure to argue to the jury that the food stamps found in Meders' possession had not been positively connected to the robbery, it is not prejudicial for an attorney to fail to point out to the jury something that is obvious from the evidence. No one said that those food stamps could be traced to the store that had been robbed. Reasonable jurists could find, as the state court did, that Meders has failed to show that if counsel had objected to the food stamps or argued that they had not been identified as the ones taken in the robbery, Meders would

41

have been acquitted.  Cf. Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1311–

12 (11th Cir. 2012) (holding that the district court should have deferred to the state

court's finding that "credited the testimony indicating that the food stamps found

in [the defendant's] room belonged to [the victim]" despite the fact that "the

evidence did not establish with certainty that the food stamps found in [the

defendant's] room belonged to [the victim]").

The state court rejected Meders' ineffective assistance of counsel claim

involving the failure to object to the admission of the cocaine citation seized from

his wallet on the ground that he had failed to establish prejudice.  Although that

citation was admitted as evidence and given to the jury (along with other

documentary evidence), it was never mentioned during the trial.  Not once.  Not

only that, but other evidence established that Meders had used and purchased

drugs.  He admitted to the jury that he "smoked a little bit of dope" (marijuana)

during the afternoon of October 13, 1987.  He also told the jury that he "had been

eating, or, well, what you call eating, had been taking some of them Valiums that

day, earlier that day."  They were 10 milligram Valiums, he said, helpfully

informing everyone from the witness stand that a 10 milligram Valium "is actually

the biggest Valium you can get."  Meders also testified that he purchased drugs,

explaining that "any time I bought dope, I bought it from [Harris]."  Meders' own

42

admissions that he used drugs were backed up by the testimony of other witnesses that he did.

Based on the other evidence presented, the jury could reasonably conclude that Meders' drug use was the cause of the debt he allegedly owed. And even if his drug use was not the cause of it, his debt was not "a critical fact for the determination of guilt," anyway, as the district court noted. All of this means that a fairminded jurist could agree with the state trial court's ruling that Meders failed to show Strickland prejudice from counsel's failure to object to the admission of the cocaine citation. Even considering any purported cumulative effect from the admission of the food stamps and cocaine citation and trial counsel's failure to present the impeachment evidence, a fairminded jurist could still conclude that it was insufficient to undermine his confidence in Meders' trial. See Reed v. Sec'y, Fla. Dep't of Corr., 767 F.3d 1252, 1263–64 (11th Cir. 2014).

## III.  CONCLUSION

Because our review is deferential, we need not determine whether our decision would be the same if we were conducting a de novo review, though we recognize that a different standard of review would make the questions in this case closer ones. Looking through the AEDPA lens, we conclude that a fairminded jurist could agree with the state trial court's decision. Or put another way, not every reasonable jurist would conclude that the state trial court's decision was

43

contrary to or an unreasonable application of Supreme Court precedent.  And for that reason, the district court did not err in denying Meders' petition for a writ of habeas corpus.

**AFFIRMED.**